MILLICENT KING McCLUSKY *v.* HARRY C. KALBEN, EXECUTOR.
JOHN F. OYEMAN, ADMINISTRATOR, *v.* HARRY C. KALBEN, EXECUTOR.
[Nos. 10, 11, October Term, 1934.]

*Decided November 19th, 1934.*

The causes were argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*Ernest Romoser* and *Philander B. Briscoe,* with whom were *Briscoe & Jones* on the brief, for the appellants.

*James Fluegel,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

On the 28th day of February, 1929, C. Harry King executed his last will and testament, and died on December 24th, 1932, leaving surviving him his widow, Anna M. King, and a married daughter, Millicent King McClusky. He devised, or bequeathed, $1,000, absolutely, to one Wanna Wilson. The residue of his estate he devised to the Mercantile Trust Company and Harry C. Kalben, in trust for the benefit of his widow, Anna M. King, for and during her natural life, and upon her death to his daughter Millicent King McClusky, the appellant in the first of the two appeals, Nos. 10 and 11, of this term, now under consideration. Harry C. Kalben, the draftsman of the will, was made executor, and as such is the appellee in both of these appeals.

At the time of the death of C. Harry King, and for several years prior thereto, he had been living apart from his wife, Anna M. King, with Wanna Wilson. A part of the time he lived in Baltimore City, and at other times in a house upon the Severn River. Mrs. King had, some years before, filed a bill for divorce, and C. Harry King a cross-bill thereto, which were pending in the Circuit Court of Baltimore City at the time of his death.

On November 7th, 1932, a marriage ceremony was performed in Towson, Md., between C. Harry King and Wanna Wilson, who was also known by witnesses, who testified in the case, as Mrs. Weston, Mrs. Wainright, Mrs. Wilson, and Mrs. King; and, as stated by Harry C. Kalben, she was known by her Christian name as Ruby, Gertrude, and Wanna.

On December 28th of the same year, letters testamentary were granted to Harry C. Kalben, who proceeded with the administration of the estate.

After the death of C. Harry King, his widow, Anna M. King, on June 1st, 1933, filed a petition, in the pending divorce proceeding, in the Circuit Court of Baltimore City, asking for the payment to her from the estate of $2,385, owing to her as unpaid alimony. The court sustained her claim, but on appeal to this court, in *Kalben v.*

*King,* 166 Md. 632, 172 A. 80, the rulings of the trial court were reversed by an opinion handed down on April 12th, 1934.

On January 21st, 1933, Harry C. Kalben, the executor, filed a petition alleging the death of C. Harry King and the issuance to him of letters testamentary upon the estate. He further alleged that the value of the estate was about $9,000, consisting chiefly of the proceeds from life insurance policies, and that a suit had been filed against him, as executor, "in the Superior Court of Baltimore City, by one Ruby G. King, otherwise Ruby G. Wilson, to recover $2,000 for money loaned to, and services performed for, the said C. Harry King, deceased; and another suit, by titling, brought against him as executor, in the Court of Common Pleas of Baltimore City, by the same plaintiff, claiming $20,000 damages, based, as stated by counsel, upon the alleged fact that the late C. Harry King had married the said Ruby G. Wilson, when he, at the time, had a wife living, from whom he had not obtained a divorce. The petition further alleged that it was necessary for him (the executor) to be "represented by counsel in these suits * * * in order to properly defend the same," and that he had "retained the services of James Fluegel, Esquire, of the Baltimore Bar to so represent him," and had agreed to pay him "subject to the approval of this * * * Court, the sum of five hundred dollars, as retaining fee in both of these actions," and prayed that the court pass an order authorizing and directing him to pay to James Fluegel the sum of $500 "as a retaining fee in said suits at law." Upon this petition the Orphans' Court on the date last named, the date of the filing of the petition, passed its order, as prayed.

On the 9th day of June, the executor, through his counsel, James Fluegel, filed with the court three petitions.

In the first of these, he alleged that he had learned that the late C. Harry King, "who had been his client for a number of years, had married * * * one Ruby G. King, without having obtained a divorce from his wife who was in California, and against whom he had a bill of complaint

pending in the Circuit Court of Baltimore City, asking for a divorce," that Ruby G. King brought suit against the executor, wherein she asked for damages to the extent of $20,000, because of injury to her resulting from her marriage to C. Harry King, caused by his misrepresentations that he had been divorced from his former wife, and was then single, when in fact he had not been divorced and was not single, and it was not until after the death of C. Harry King, who committed suicide on the 24th day of December, 1932, that she learned that she was not his legal widow and was a victim of his deceit. The petitioner then alleged that he could "compromise said claim by the payment of the sum of $2,000, and the costs incident to the proceedings," and that he was "advised by his counsel * * * that it would be to the advantage of the estate * * * to effectuate said compromise, as the essential facts constituting the alleged wrongs complained of by the said Ruby G. King, are matters of record, that cannot be denied, and are of such a character that the case is one that calls for a settlement out of court." The petition then prayed that the executor be authorized and directed to compromise the case for the sum of $2,000 and the costs incident to the proceedings.

The second petition asked for authority and direction to the executor to compromise the suit brought by Ruby G. King to recover the sum of $960, for money borrowed from her by C. Harry King, in his liftime, and for services rendered in nursing him, by the payment to her of $500. In the petition it was alleged "that the fact of said monies having been lent, and said services having been rendered, cannot be disputed successfully," for which reasons the petitioner recommended the passage of the order.

The third petition filed by the executor, through his counsel, asked for authority and direction to compromise by payment to plaintiff John C. Kump of $1,200 in settlement of the suit brought by him to recover the sum of $1,673, "the same being for cash monies laid out by him for the late C. Harry King, amounting to the sum of $1,388.38,

on the first day of October, 1929," with interest from the date last named to the first day of March, 1933. In this petition the executor alleged "that the correctness of said claim was personally known" to him "as the attorney for the late C. Harry King, on account of the many times demand had been made on him for the sum of $1,388.38, and accrued interest, while the said C. Harry King lived, but which monies he was unable to pay to the said John C. Kump."

On each of these three petitions an order was passed, authorizing and directing the executor to compromise the suit, as prayed.

On July 1st, 1933, a further petition was filed by the executor, asking for the payment of an additional fee of $500 to his counsel for the estate. These services consisted: First, of the demand for a bill of particulars in two of the suits, and the filing of pleas in the three suits; second, interviews and investigations conducted by counsel on behalf of the estate, in connection with the petitions asking authority to compromise the cases, which, as alleged, resulted in a great saving to the estate; third, his services in connection with the entry of judgment in each of the cases upon the compromise effected; and fourth, his services in the trial court and in this court on appeal, on the petition filed by Anna M. King, in the divorce case in the Circuit Court of Baltimore City, heretofore referred to, asking for the payment out of the estate of the unpaid balance of the alimony claimed to be owing to her. Upon this petition, the court, by its order passed on July 1st, 1933, allowed the additional fee of $500, which amounted in all to the sum of $1,000 allowed him for the services above recited.

On the 10th day of November, 1933, the appellant Millicent King McClusky filed her petition, in which she prayed that the orders passed on January 21st, June 9th and July 1st, 1933, should be vacated and dismissed. In the petition she alleged that, though vitally interested in the estate of her father, she learned for the first time of the status of the estate on or about the 30th day of October,

1933, which was about two months after her return to Annapolis, Md., from Honolulu, Hawaii, where she, with her husband, an officer in the United States Navy, had lived for about two years. That her whereabouts could have been easily ascertained through friends and acquaintances living in Baltimore. She alleged that she had much information and data which would have proved valuable in the settlement or defense of the claims upon which suits had been brought against the estate, that her mother's whereabouts were likewise easily ascertainable, and she, too, had information that would have been useful and helpful in the resistance of these claims or suits, but that neither she nor her mother was consulted or conferred with by any representative of the estate relative to such claims or suits. On November 10th, 1933, Anna M. King filed a petition similar to the one filed by her daughter, containing like allegations, and she, too asked for the vacation and dismissal of said orders of January 21st, June 9th, and July 1st, 1933. After filing her petition, Anna M. King died, and upon the suggestion of her death and the appointment of John F. Oyeman as her administrator, the latter was made party petitioner in her stead, and as such is the appellant in No. 11 Appeals.

Answers were filed by the executor to the petitions of Mrs. McClusky and Mrs. King. In them many of the allegations contained in the petitions of the executor, asking for authority and direction to compromise the suits mentioned, and the payment of the fee to James Fluegel, his attorney, are repeated. In addition thereto, there are allegations denying that Anna M. King and her daughter Millicent King McClusky were without knowledge as to the status of the case, and alleging that they, or at least their counsel, were informed of the proposal to compromise the suits named, and actually knew of the compromises when made, and that they made no objection thereto, or at least expressed no dissatisfaction therewith.

The court, after hearing evidence upon the petitions of Millicent King McClusky and Anna M. King, and the answers thereto by the executor, passed its order, on the

15th day of March, 1934, dismissing the petitions, and requiring the petitioners to pay the costs. It is from this order of March 15, 1934, that these appeals were taken. The first, No. 10, by Millicent King McClusky; and the second, No. 11, by John F. Oyeman, administrator of the estate of Anna M. King, deceased.

The questions to be decided in this case are: First, whether the court was right in the passage of its order of March 15, 1934, dismissing the petitions of Millicent King McClusky and Anna M. King, asking for the vacation and dismissal of the orders previously passed by the court, authorizing and directing the executor to compromise the claims and suits brought against him, as prayed. Second, whether the court was right in the passage of its order of March 15, 1934, dismissing the petitions of Millicent King McClusky and Anna M. King, asking for the vacation and dismissal of the orders allowing to James Fluegel, as counsel for the executor, fees amounting in the aggregate to the sum of $1,000. We will pass upon and determine these questions in the order in which they are herein stated.

Code, art. 93, sec. 270, provides: "The Orphans' Court shall have power to authorize and direct any executor, administrator or guardian to compromise any claim against or in favor of the estate of any decedent or ward, as the case may be, in such manner as the said court may approve." This Code provision undoubtedly gives to the orphans' court jurisdiction to compromise claims or suits against the executor of the decedent, and it is with it to determine when such power should be exercised. To enable the court to determine this question properly, the essential facts relative to the claim or suit should be presented to it.

In the case of *Badders v. O'Brien*, 114 Md. page 451, 79 A. 917, 918, the questions there presented are similar to those presented in this case. William J. O'Brien, as executor of the last will and testament of Joseph Zane, filed a petition alleging that one Gertrude Flaherty had sued him for $15,000 in the Baltimore City Court, for services

rendered to the testator as housekeeper, nurse, and companion, for a stated period of time covering about six years, that the counsel employed by him to defend the suit advised him to accept the proposition made by the plaintiff's counsel to compromise the suit for $1,000, as a liquidated amount to be allowed in the administration account to be passed by him, and that he, himself, was satisfied, after careful investigation, that it would be to the interest of the estate to make the compromise. Upon that petition the orphans' court passed an order authorizing and directing the executor to compromise and settle the suit and claim, as prayed in the petition and according to the terms therein set forth. In that case, too, a fee was allowed counsel for the executor, "as per order of Court." The appellant, a legatee under the will of Zane, excepted to the action of the court in respect to the compromise and settlement of said claim, and also to the allowance of the fee of $500 to executor's counsel. Evidence was heard on the exceptions taken, and the court, speaking through Judge Schmucker, said: "We refrain from a consideration in detail of the evidence, because, taken as a whole, it satisfies us that her suit against his estate was not devoid of a substantial foundation, and that therefore the compromise of the claim for so small a portion of its face value made by the executor under the authority and direction of the orphans' court in the manner already mentioned by us should be upheld." After quoting the Code provision above set out, the court further said: "This act does not confer upon the orphans' courts the full powers, with which courts of law and equity are invested, of deciding upon the validity and determining the amount of a creditor's claim against the estate of a decedent or ward, but merely the power to authorize and direct an executor or guardian to compromise the claim on such terms as meet the court's approval, without undertaking to determine its legal status or exact amount. The law looks with favor upon the amicable settlement of controversies and the prevention of litigation, and a statute conferring power to effect compromises of claims threatening to in-

volve estates in litigation upon a subordinate tribunal that is not fully equipped to determine their precise legal merits is in harmony with the policy of the law, and the exercise of that power when fairly made should be upheld, in the absence of evidence of positive error or injustice. We find no such error or injustice in the case before us as to induce us to reverse the action of the orphans' court in directing the compromise of Gertrude Flaherty's claim."

Harry C. Kalben, the executor, who had been counsel for C. Harry King for years prior to his death, testified, as to the claim or suit of John C. Kump, that he "knew it to be absolutely correct, that he knew it was due and owing and that he (Kump) advanced that money for Mr. King and that Mr. King never paid him back." That he had accompanied Mr. King to the office of Mr. Kump on two or three occasions in relation to this claim, and King had said to him: "What is the matter with John Kump? He knows the condition and position I am in. Why is he pressing me with this matter? I am going to pay it. Just at this time I don't want any indebtedness against me." These facts were known to the executor at the time of the filing of the petition asking that he be given authority to compromise Kump's claim, and these facts were not contradicted. It was upon this information that the executor, in his petition, alleged the correctness of the claim was personally known to him. There cannot, we think, be found any positive error or injustice in the court's action in passing the order authorizing and directing the compromise of this claim.

There is some evidence found in the record supporting the claim of Wanna Wilson for the recovery of money loaned the decedent and for services rendered him in caring for and nursing him. It is shown that she, at times, loaned him money, and there is evidence clearly establishing the fact that she not only rendered him service, but valuable service, in caring for and nursing him, though it is not shown that she was not repaid the money loaned, or was not paid for the services rendered. Never-

theless, we do not think, upon the evidence relative to this claim, reduced by the compromise nearly fifty per cent., we are justified in holding there was positive error on the part of the court in ordering this claim to be compromised.

The other claim of Wanna Wilson, upon which suit was entered for the sum of $20,000, was to recover for the alleged "injury to her health, good name and reputation, caused by her marriage to C. Harry King, resulting," as alleged, from his misrepresentations to her that he had been divorced from his wife, Anna M. King, and was at the time unmarried.

The evidence in this case shows that for years prior to the alleged marriage, the decedent and Wanna Wilson were living together as man and wife. This fact was known to a number of persons, including those who visited the house in which they lived, and to whom she was introduced by the decedent as his wife, "Mrs. King." In addition to these facts, it is disclosed by the evidence of one James J. Callahan, an employee of the Daily Record, that he "lived on West Franklin Street in the same premises in which Mr. King and Wanna Wilson lived." His apartment was on the second and third floor, "the front of the first floor being occupied by Mr. King as an office, and the rear of the first floor being living quarters." That Wanna Wilson came to live with Mr. King while he (the witness) was living in his said apartment. About May, 1928, witness first met her. He was introduced to her by Mr. King as "Mrs. King." He afterwards learned from Wanna Wilson that she was, at the time, the wife of Wade Wilson, a traveling carnival or circus man, who was at that time living. That on one occasion Wade Wilson, her husband, came to Baltimore with a circus, and the "wife of the witness went out with Wanna Wilson to see her husband at a carnival." It thus appears from this evidence that, so late as 1928, or 1929, Wanna Wilson was a married woman, and it is not shown that she was ever divorced, or that her husband was dead at the time of the alleged marriage to C. Harry King. These were

important factors to be considered in her efforts to recover damages for loss and injury to her health, good name, and reputation. As claimed by her, she was subjected to great "physical pain and mental anguish, rendered sick in body and mind, subjected to embarrassment and ridicule, injured and damaged in her good name, character and reputation, and has been otherwise greatly and seriously injured and damaged." Yet these facts, as shown by the record, were never presented to the court in asking authority to compromise the claim.

In the executor's petition, asking for authority to compromise this claim, he alleged that "the essential facts constituting the * * * wrongs complained of * * * are matters of record that cannot be denied." The facts of record, to which he refers, must have been the marriage at Towson, and that he was not divorced from his wife, Anna M. King, in California. These may have been essential facts, but they were not all the essential facts; there were other facts, among them, her chastity, and whether at the time of her alleged marriage to King she was unmarried. These facts necessarily were involved in determining the amount of injury, if any, her character suffered from said marriage. It was the duty of both the executor and his counsel to investigate all essential matters relative to the claim, that they might place such facts before the court for it to determine the advisability of the compromise, and if compromised, the terms of such compromise. This was not done, and though it is alleged that many investigations have been made, it is not attempted by the executor, or his counsel, to show what was specifically done by them in such investigation, or with whom they conferred to obtain the desired information. A number of witnesses who testified in the case and from whom, as indicated by their evidence, important facts could have been obtained, were never consulted by either the executor or his counsel.

Wanna Wilson, though a much interested party, was not present and did not testify at the proceeding in which the order appealed from was passed. In reference to her

absence, her attorney, Meyer Steinberg, who brought the suit, testified as to the whereabouts of his client; he stated: "She was at an unknown address in Virginia, but witness does not know the place of her permanent home, but that her address when she is in Baltimore is somewhere in the 1600 block Eutaw Place, he not having the exact address but does have the telephone number where he used to reach her on the telephone when the suit was filed on the 6th of March, 1933."

It is not shown that the executor, or his counsel, conferred with Steinberg, counsel for Wanna Wilson, to further acquaint themselves with the facts of the case, or that they made any effort to have her present to testify at the hearing, though Mr. Steinberg knew the telephone number that he had used to reach her some months before.

The facts shown relative to this claim, known to the executor, or to his counsel, or which should have been known to them, had the proper investigation been made as to its merits, do not, we think, warrant us in holding that the passage of this order, authorizing the compromise of the claim, was without error or injustice to those interested as legatees, devisees, or creditors of the estate.

The second question to be decided is whether the fee of $1,000, allowed counsel for the executor, was a reasonable allowance to him for the services shown to have been rendered by him to the estate.

This court, in *Knapp v. Knapp*, 151 Md. 131, 134 A. 24, 26, speaking through Judge Digges, said: "The principal elements to be considered in determining the reasonableness of counsel fees are, the amount involved, the character and extent of the services, the time employed, the importance of the question, and the fidelity and diligence of counsel. It is apparent that no one of these elements is controlling, but consideration must be given to all in arriving at a fair and just conclusion."

After a careful consideration of all these elements found in this case, we cannot escape the conclusion that

the amount allowed was unreasonable and excessive. With the exception of the services rendered in the divorce proceeding in the Circuit Court of Baltimore City, and in this court, on appeal in *Kalben v. King*, 166 Md. 632, 172 A. 80, the services rendered were by no means difficult to perform. The demand for a bill of particulars in two of the suits and the filing of general issue pleas in the three suits; the interviews and investigations conducted by counsel in connection with the petitions asking authority to compromise the cases; and the entry of judgments, after the compromises were effected, required little skill, and, it would seem, from the evidence in the case, consumed little time, considering the character and extent of the investigations made, as hereinbefore stated. In said case of *Kalben v. King*, which was decided on demurrer, there was more work and greater skill required. Upon the evidence found in the record, from which inference may well be drawn that the investigation made was exceedingly meager, and that the knowledge of the executor as to the wisdom of compromise was based upon his own impressions, with little or no aid from his counsel in reaching his conclusion, we are of the opinion that an allowance of $500 for the entire services rendered by him would be fair and reasonable, notwithstanding the fact that certificates were obtained from two members of the Baltimore City Bar, in active practice, and high standing, stating that the allowance was, in their opinion, fair and reasonable. It may have been that these gentlemen were not in possession of all of the facts that were thereafter produced in evidence, reflecting upon the extent and value of such services.

As a result of our conclusions, the order of March 15th, 1934, appealed from, will be reversed to the extent, first, of its refusal to vacate and set aside the order of June 9th, authorizing and directing the compromise of Wanna Wilson's suit of $20,000, for alleged injuries suffered by her, resulting from her marriage to C. Harry King, caused by his alleged misrepresentations to her; and, second, in its refusal to annul or set aside the order

of July 1st, 1933, allowing an additional fee of $500 to executor's counsel.

The order appealed from will be affirmed in part and reversed in part.

> *Order affirmed in part, and reversed in part. The appellee, Harry C. Kalben, executor, to pay the costs.*